**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **GEORGE RHINEHART,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:06-CV-00080** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff George Rhinehart appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will be

AFFIRMED.

## I.  PROCEDURAL HISTORY

Rhinehart applied for DIB on March 21, 2003, alleging that he became disabled as of

November 27, 2001. (Tr. 506-11.)  The Commissioner denied his application initially and upon

reconsideration, and Rhinehart requested an administrative hearing. (Tr. 512-14, 516-22.)  On

September 30, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing

at which Rhinehart, who was represented by counsel, and Chris Young, a vocational expert

("VE") testified. (Tr. 47-77.)  On March 15, 2005, the ALJ rendered an unfavorable decision to

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

Rhinehart, concluding that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of other jobs in the national economy. (Tr. 12-23.)  The Appeals Council denied Rhinehart's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-11, 499-501.)

Accordingly, Rhinehart filed a complaint with this Court on March 16, 2006, seeking relief from the Commissioner's final decision. (Docket # 1.)  This appeal became ripe for the Court's review as of March 19, 2007. (*See* Docket # 17-22.)

## II.  RHINEHART'S ARGUMENTS

Rhinehart alleges three errors in the Commissioner's final decision.  Specifically, Rhinehart claims that the ALJ erred by: (1) improperly evaluating the opinion of his treating psychiatrist; (2) incorrectly posing a hypothetical to the vocational expert; and (3) determining that his testimony of debilitating limitations was "not totally credible." (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") at 15-21.)

## III.  FACTUAL BACKGROUND[2]

### A.  Background and Daily Activities

At the time of the ALJ's decision, Rhinehart was forty-nine years old, had an eleventh grade education, and possessed work experience as a roofer, service station manager, warehouse worker, and cashier. (Tr. 12, 16, 85, 509.)  Rhinehart alleged in his DIB application that he became disabled as of November 27, 2001, due to lower leg problems, heart problems, diabetes, and anxiety. (Tr. 79.)  More specifically, Rhinehart's physical problems include a severe fracture

---

[2] The administrative record in this case is voluminous (524 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

of his left leg in June 1999, a heart attack in November 2001, and problems with his cervical spine that prompted surgery in April 2002.[3] (Tr. 134, 156-58, 193, 202-03, 381, 457-60, 486.)  In this appeal, however, Rhinehart challenges solely the ALJ's evaluation of his mental impairments; thus, the Court will focus on Rhinehart's alleged mental impairments in this Order.

At the hearing, Rhinehart testified that he lives in a single-story home with his wife, who works outside the home. (Tr. 50-52.)  Rhinehart explained that he independently performs his bathing and dressing and performs "some vacuuming from time to time," but that he does not perform any other household chores such as cleaning or cooking. (Tr. 66.)  He also stated that he drives a car. (Tr. 65.)  When asked to describe his typical day, Rhinehart explained that he rises at about 8:00 a.m. and begins his day by drinking coffee and playing computer games. (Tr. 66.)  He then watches television the remainder of the day, sometimes vacuuming one room at a time. (Tr. 67.)  Rhinehart also reported that he has trouble sleeping, stating that he "just can't fall asleep."[4] (Tr. 59.)

For leisure, Rhinehart stated that he enjoys fishing, but that he rarely does so anymore because he is "afraid [he's] going to have a heart attack out in the boat." (Tr. 64.)           He further explained that he used to play Bingo four times a week and would occasionally attend events at the Fort Wayne Coliseum, but that he no longer participates in these activities because he "ha[s] panic attacks and [he's] got to get up and leave." (*Id*.)  Rhinehart stated that he generally leaves his home only three times per week because he is "afraid to go out and be

---

[3] Curiously, though Rhinehart alleges that he did not work after his heart attack in November 2001, medical reports from March 2002 and June 2002 state that he was working at that time. (*Compare* Tr. 79-80, *with* Tr. 134, 324.)

[4] Rhinehart stated that he previously underwent surgery for severe sleep apnea. (Tr. 59.)

around people," explaining that he is generally "scared of people." (Tr. 65, 68.)  In fact, Rhinehart confessed at the hearing that he was "frightened to death" to be present at the hearing. (*Id*.)

Rhinehart explained that he sees a psychiatrist every three months for his anxiety and that since 2000 he has been taking medications to manage his symptoms. (Tr. 68-69.)  He reported that while the medications calm him down, they also make him tired. (*Id*.)  Rhinehart stated that in the six months preceding the hearing he has also been seeing a therapist twice a month for his panic attacks. (Tr. 70.)  When asked about his results from therapy, Rhinehart stated: "[The therapist's] been helping me a little bit, quite a bit really." (*Id*.)

B.  *Summary of the Medical Evidence Pertaining to Rhinehart's Mental Impairments*

On April 6, 2000, Rhinehart reported to Dr. Richard Tielker, his family practitioner, that he thought he was having panic attacks, as he felt faint, had shortness of breath, and was experiencing a feeling of fear. (Tr. 267.)  He was prescribed Zoloft. (*Id.*)  After he began taking Zoloft, Rhinehart reported some improvement, although Dr. Tielker continued to reference panic attacks in his notes through January 2001. (Tr. 265-67.)  Dr. Tielker's subsequent notes do not appear to reflect any further references to Rhinehart experiencing panic attacks, though Rhinehart complained to Dr. Tielker in early 2002 of decreased sex drive secondary to his taking Zoloft. (Tr. 257-64, 364-72.)

In February 2002, Rhinehart completed a History Screening Form in which he stated that he had not experienced problems with depression or emotional disturbances in the previous year. (Tr. 147.)  However, in April 2003, Rhinehart told his cardiologist that he had been having panic attacks; his cardiologist concluded that Rhinehart suffered from a panic disorder with possible

agoraphobia. (Tr. 271-72.)

### 1.  Dr. Bundza, Examining Psychiatrist

Rhinehart's first visit to a mental health professional occurred on June 9, 2003, when he visited Dr. Kenneth Bundza for a mental status evaluation at the request of the Social Security Administration in connection with his claim for DIB. (Tr. 281-84.)  Rhinehart reported to Dr. Bundza that he experienced depression that made him "sad all the time" and that he rarely left the house due to panic attacks that typically occurred when he was around strangers or in a crowd. (*Id*.)  Rhinehart further stated that he had very little energy and that he did not seem to care about anything; however, he denied any suicidal ideation. (*Id*.)  He explained that his emotional problems began about a year and a half earlier after he experienced a heart attack. (*Id*.)  He also stated that he was feeling "somewhat tense" during the appointment because he was around a stranger and in a strange setting. (*Id*.)

Dr. Bundza observed that Rhinehart walked slowly and appeared rather anergic and somewhat depressed. (*Id*.)  He noted, however, that Rhinehart maintained appropriate emotional control and that he was cooperative and socially appropriate. (*Id*.)  Though Rhinehart could not identify the Mayor of Fort Wayne or the Governor of Indiana, Dr. Bundza's remaining observations and mental status findings were normal. (*Id*.)  More specifically, Rhinehart's grooming and hygiene were adequate; he demonstrated adequate verbal communication skills; he exhibited no signs of psychosis; he was cooperative and socially appropriate; he was alert and oriented in all spheres; he had an adequate fund of personal information; he demonstrated adequate long-term, intermediate, and short-term memory; he had reasonably well-developed arithmetic skills; and he did not demonstrate any deficits in judgment, common sense, and

abstract reasoning abilities. (*Id*.)

Dr. Bundza noted that Rhinehart was receiving only minimal psychotherapeutic intervention in the form of medication, but suspected that more intensive treatment would probably only have a minimal impact given the significant role that Rhinehart's health problems appeared to play in his overall situation. (*Id*.)  Dr. Bundza diagnosed Rhinehart with major depression, single episode, moderate and panic disorder with agoraphobia, assigning him a score of 50 on the Global Assessment of Functioning (GAF) Scale.[5] (*Id*.)

2.  Dr. Klion, Reviewing State Agency Psychologist

Also in June 2003, R. Klion, Ph.D, a psychologist with the Indiana state agency that makes disability determinations for the Social Security Administration, reviewed Rhinehart's medical record. (Tr. 293-309.)  First, addressing the four broad areas of functioning defined in 20 C.F.R. § 404.1520a(c)(3), Dr. Klion concluded that Rhinehart's mental impairments resulted in a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no extended episodes of decompensation. (Tr. 303.)  Dr. Klion also completed a worksheet assessing Rhinehart's ability to perform twenty more specific mental activities; he found that Rhinehart was moderately limited in his ability to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and accept instructions

---

[5] GAF is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).  A GAF score of 50 means an individual experiences serious symptoms or a serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*.

and respond appropriately to criticism from supervisors, but that he was "not significantly limited" in the remaining seventeen activities. (Tr. 307-08.)  Finally, Dr. Klion provided a functional capacity assessment that stated Rhinehart could do work consisting of "simple, repetitive tasks." (Tr. 309.)

### 3.  Dr. Jennifer Fray and Dr. Larry Lambertson, Treating Psychologist and Psychiatrist at Park Center

On January 15, 2004, Rhinehart visited Jennifer Fray, Ph.D., a psychologist at Park Center, at the suggestion of his wife's employee assistance plan. (Tr. 344-47.)  Rhinehart stated to Dr. Fray that he was depressed, did not socialize much, and stayed home most of the time due to his anxiety over having panic attacks. (*Id.*)  He also reported some decreased libido, difficulty with sleeping, problems with concentrating, and decreased self esteem. (*Id.*)  Rhinehart further confided that though he had experienced panic attacks prior to his heart attack in 2001, he was able to function fairly well at that time because he worked as a roofer and did not have to interact with people; however, Rhinehart explained that after his heart attack he had to work in other positions, which contributed to his anxiety. (*Id.*)

Dr. Fray noted that Rhinehart's mood and affect were anxious and that there was some element of helplessness and hopelessness about his symptoms. (*Id.*)  However, Dr. Fray's remaining examination findings were normal. (*Id.*)  More specifically, Dr. Fray noted that Rhinehart's appearance and behavior were appropriate; his insight and judgment were normal; his speech and thinking form were normal; he had no memory problems; he was fully oriented; and he denied suicidal and homicidal thoughts. (*Id.*)  Dr. Fray assigned Rhinehart a diagnosis of panic disorder with agoraphobia and major depressive disorder, mild, single episode, assigning him a GAF score of 50. (*Id.*)

One week later, Rhinehart visited Dr. Larry Lambertson, a psychiatrist at Park Center, and again described his problems with depression and panic attacks, stating that he had trouble leaving his home. (Tr. 342-43.)  Dr. Lambertson's mental status examination findings, however, were all normal. (*Id*.)  More particularly, Dr. Lambertson noted that Rhinehart was pleasant and cooperative; his speech was clear and goal-directed; his mood was fairly normal; his affect was appropriate; he was not noticeably depressed or anxious; he presented himself very well; there was no evidence of psychotic symptoms; he denied suicidal or homicidal ideation; his judgment and insight around social situations were good; his recent and remote memory were intact by history; his vocabulary was consistent with average intellectual functioning; and there was no evidence of gross organicity. (*Id*.)  Dr. Lambertson diagnosed Rhinehart with panic disorder with agoraphobia and major depressive disorder, moderate, single episode, assigning him a GAF score of 50. (*Id*.)  Dr. Lambertson then prescribed Xanax for Rhinehart's anxiety and Trazodone for his sleep problems. (*Id*.)

In April 2004, Dr. Fray affirmed her earlier diagnosis of Rhinehart but increased his GAF rating to 60.[6] (Tr. 337-39.)  Rhinehart reported to Dr. Fray that he was willing to leave his house and challenge his fears. (*Id*.)  In July 2004, Dr. Fray reported that Rhinehart continued to experience depression, panic attacks, and a great deal of social withdrawal. (Tr. 357.)  Rhinehart stated, however, that his depression had improved "a little bit" and that he was not dwelling on it as much and was enjoying time with his grandson. (*Id*.)  Dr. Fray also reported that Rhinehart was making efforts to socialize with his family for certain events and that he had gone shopping

---

[6] A GAF score of 60 means an individual experiences moderate symptoms or has moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Ass'n, *supra*, at 34.

with his wife. (*Id.*)  Dr. Fray planned to incorporate family therapy into Rhinehart's treatment. (*Id.*)

In August 2004, Dr. Lambertson completed a Mental Residual Functional Capacity questionnaire on Rhinehart's behalf. (Tr. 350-54.)  He stated that Rhinehart was "unable to work" and that his current GAF rating was 50, noting that 60 was his highest GAF score in the past year. (*Id.*)  Dr. Lambertson reported a decrease in Rhinehart's depression and frequency of panic attacks in response to treatment. (*Id.*)  When asked to identify clinical findings demonstrating the severity of Rhinehart's symptoms, he noted "overwhelming panic in social settings where there are crowds, or strange people or places where he cannot get away." (*Id.*)  When asked to select Rhinehart's clinical signs and symptoms from a checklist, Dr. Lambertson's choices included generalized persistent anxiety, difficulty thinking or concentrating, emotional withdrawal or isolation, persistent irrational fears, memory impairment,[7] and persistent severe panic attacks. (*Id.*)

In addition, Dr. Lambertson stated that Rhinehart was "unable to meet competitive work standards" for several mental abilities relating to unskilled work, including: maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or in proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; maintain socially appropriate behavior; and travel to unfamiliar places. (*Id.*)

---

[7] Curiously, in his initial evaluation Dr. Lambertson reported that Rhinehart's recent and remote memory were "intact." (*Compare* Tr. 343, *with* 351.)

When asked to identify the findings supporting his assessment, Dr. Lambertson stated that

Rhinehart had feelings of increased anxiety when stressed in work or social situations, which

were increased by his physical limitations. (*Id.*)  In response to the question whether Rhinehart's

psychiatric condition exacerbated his physical symptoms, Dr. Lambertson stated: "No – the

physical exacerbates the emotional." (*Id.*)

### C.  Summary of the VE's Testimony

At the hearing, the ALJ posed the following hypothetical to the VE:

> Assume an individual with the same age, education and work background as the
> claimant who would be limited to sedentary work, with additional limitations in
> that he would be limited to simple, routine repetitive tasks and can be around
> employees throughout the day but only occasional conversations and
> interpersonal interaction.  Assuming these as the limitations would there be any
> work that a hypothetical claimant could perform?

(Tr. 73.)  In response, the VE testified that such a hypothetical individual could perform a

number of unskilled sedentary jobs, including an addresser (275 jobs in the region), circuit board

assembler (325 jobs in the region), and escort vehicle driver (250 jobs in the region). (Tr. 73-74.)

Rhinehart's attorney then cross-examined the VE:

Q      [I]f an individual were not able to meet competitive standards in terms of
       performing at a consistent pace without an unreasonable number and length of
       rest breaks, would any of the jobs you cited, would such a person be able to
       perform in any of those jobs?

A      No.

Q      Are there other jobs that would accommodate such a restriction?

A      No it would not.

(Tr. 75.)

# IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

# V.  ANALYSIS

## A.  The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[8] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

On March 15, 2005, the ALJ rendered his opinion. (Tr. 15-23.)  He found at step one of the five-step analysis that Rhinehart had not engaged in substantial gainful activity since his alleged onset date, and at step two that he had severe impairments with respect to his lower extremity problems, heart problems, diabetes, and anxiety. (*Id.*)  However, at step three, he

---

[8] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

determined that Rhinehart's impairments were not severe enough to meet a listing. (*Id.*)  Before

proceeding to step four, the ALJ determined that Rhinehart's testimony of debilitating

limitations was "not totally credible" and that he had the following RFC:

> the residual functional capacity to perform sedentary unskilled work that does not
> involve more than simple, repetitive tasks.  He is able to be around fellow
> employees throughout the workday, but can have only occasional conversations
> and personal interaction with them.  He is able to lift and carry ten pounds
> occasionally and less than ten pounds frequently.  In an eight-hour period, the
> clamant is able to sit for a total of six hours and stand/walk for a total of at least
> two but less than six hours.

(Tr. 22.)

Based on this RFC, the ALJ concluded at step four that Rhinehart could not perform his

past relevant work. (*Id.*)  Thus, the ALJ proceeded to step five where he determined that,

considering his age, education, and experience, Rhinehart could perform a significant number of

jobs within the national economy, including an addresser, circuit board assembler, or vehicle

escort driver. (*Id.*)  Therefore, Rhinehart's claim for DIB was denied. (Tr. 23.)

Rhinehart claims, however, that the ALJ erred in denying his DIB application by: (1)

improperly evaluating the opinion of his treating psychiatrist; (2) incorrectly posing a

hypothetical to the vocational expert; and (3) determining that his testimony of debilitating

limitations was "not totally credible."  None of Rhinehart's arguments ultimately merit a remand

of the Commissioner's final decision.

### C.  The ALJ Adequately Evaluated the Opinion of
### Dr. Lambertson, Rhinehart's Treating Psychiatrist

The Seventh Circuit has stated that "more weight is generally given to the opinion of a

treating physician because of his greater familiarity with the claimant's conditions and

circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this

13

principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).  In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, "[a] claimant is not entitled to DIB simply because his treating physician states that he is 'unable to work' or 'disabled,'" *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p.  In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see also* 20 C.F.R. § 404.1527(e)(3); *Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006).  "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether the individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual

14

is disabled." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.  Nonetheless, "opinions

from any medical source on issues reserved to the Commissioner must never be ignored." SSR

96-5p; *see also Frobes*, 2006 WL 3718010, at *8.  "In evaluating the opinions of medical

sources on issues reserved to the Commissioner, the adjudicator must apply the applicable

factors in 20 C.F.R. 404.1527(d) . . . ." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8.


Here, the ALJ specifically considered Dr. Lambertson's opinion that Rhinehart was

unable to maintain regular attendance or be punctual, work with or near others without being

unduly distracted by them, perform at a consistent pace, complete a normal workday or

workweek without interruption from psychologically-based symptoms, interact appropriately

with the general public, maintain socially appropriate behavior, travel in unfamiliar places, or

use public transportation. (Tr. 17.)  The ALJ also noted Dr. Lambertson's records that stated

Rhinehart suffered from decreased energy, feelings of guilt or worthlessness, anxiety, mood

disturbances, and panic attacks. (*Id.*)  Nonetheless, the ALJ ultimately discounted Dr.

Lambertson's opinion and instead assigned greater weight to the opinion of Dr. Klion, the

reviewing state agency physician, who concluded that Rhinehart could perform work consisting

of "simple, repetitive tasks" despite the moderate limitations in his ability to maintain attention

and concentration for extended periods.  The ALJ then emphasized that his conclusion was

consistent with the objective medical evidence, which includes generally negative mental

examination findings and GAF scores ranging from 50 to 60, as well as Rhinehart's daily

activities.[9]

In pursuit of a remand, Rhinehart contends that the ALJ erred because he "gives no explanation of the weight that he gave the opinion of Dr. Lambertson," arguing that the ALJ failed to consider the opinion with respect to the factors articulated in 20 C.F.R. § 404.1527(d). (Pl.'s Opening Br. at 16.)  Rhinehart's argument, however, is unconvincing, as the ALJ's path of reasoning in consideration of the relevant factors is easily traceable in this instance. *See Books*, 91 F.3d at 980 ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." (citations and internal quotation marks omitted)).  First, the ALJ acknowledged Dr. Lambertson's specialty in psychiatry. (Tr. 17.)  Second, the ALJ noted that Rhinehart had not commenced mental health treatment with Dr. Lambertson until January 2004 (*id*.), thus indicating that he considered the length of the treatment relationship between Dr. Lambertson and Rhinehart. *See Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985) ("[T]he ALJ must take into account the treating physician's ability to observe the claimant over a longer period."); *see generally White v. Barnhart*, 415 F.3d 654, 658-59 (7th Cir. 2005) ("Indeed, it is difficult to think of more appropriate factors than a physician's speciality and familiarity with the patient and his medical history when determining how much weight to assign to his opinions.").

Third, the ALJ stated that Rhinehart's daily activities, including playing computer games,

---

[9] Rhinehart argues that the ALJ erred by crediting the opinion of Dr. Klion, a non-examining physician, stating that "'a contradictory opinion of a non-examining physician does not, by itself, suffice' as substantial evidence." (Pl.'s Opening Br. at 17-18 (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).  However, as will be discussed *infra*, the ALJ also relied upon other objective medical evidence of record and Rhinehart's daily activities when assigning his RFC; thus, Rhinehart's argument under *Gudgel* is without merit.

watching television, caring for his personal needs, going with his wife to family functions, vacuuming occasionally, and driving himself to doctors' appointments, were consistent with the RFC ultimately assigned to Rhinehart, inferring that more severe limitations, such as those opined by Dr. Lambertson, were not consistent with the record as a whole. (Tr. 18); *see* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  In that vein, the ALJ specifically observed that Dr. Lambertson's statement that Rhinehart may have difficulty interacting with the general public lacked support in the record, as Rhinehart's treating and examining physicians all described him as alert, pleasant, oriented, and cooperative. (Tr. 18; *see, e.g.*, Tr. 145, 278, 282, 327, 342.)

Fourth, the ALJ emphasized that his conclusion was consistent with the lack of objective medical evidence to support more severe limitations, emphasizing that the findings from all of Rhinehart's mental examinations were generally normal, detecting no cognitive or intellectual deficits. (Tr. 18); *see* 20 C.F.R. § 404.1527(d)(3); *White*, 415 F.3d at 659 (discounting a treating physician's opinion because it was based on claimant's subjective complaints and lacked the support of objective medical evidence).  Thus, clearly the ALJ adequately addressed the factors prescribed in 20 C.F.R. § 404.1527(d), allowing this Court to adequately trace his path of reasoning with respect to the discounting of Dr. Lambertson's opinion and the ultimate assignment of Rhinehart's RFC. *See Books*, 91 F.3d at 980; *see generally Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (stating that when reviewing an ALJ's decision, a court will "give the opinion a commonsensical reading rather than nitpicking at it" (citations omitted)); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common

17

sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Rhinehart launches several other arguments in an effort to criticize the ALJ's failure to adopt into his RFC the severe restrictions assigned by Dr. Lambertson.  First, Rhinehart criticizes the ALJ's assertion that his conclusion that Rhinehart could perform work involving simple, repetitive tasks is "consistent" with the GAF scores in the record.  As explained *supra* in footnote 5, a GAF score of 50 reflects a serious impairment in social, occupation, *or* school functioning (e.g., no friends, unable to keep a job); thus, a GAF score of 50 does not conclusively represent a serious impairment in *occupational* functioning.  Here, the ALJ accommodated Rhinehart's limitations in *social* functioning by limiting him to tasks that do not require him to have more than occasional conversations and personal interactions with fellow employees.  This is consistent with Rhinehart's statement to Dr. Fray that though he had experienced panic attacks prior to his heart attack in 2001, he was still able to function fairly well because he worked as a roofer and did not have interaction with people. (Tr. 345.)  Indeed, Dr. Klion acknowledged that Rhinehart was assigned a GAF of 50 but still concluded that he could perform work involving "simple, repetitive tasks."  On this record, the ALJ did not err in suggesting that the GAF scores of record were consistent with the RFC assigned to Rhinehart.

Rhinehart next contends that the ALJ improperly equated his daily activities to an ability to return to the workforce.  Contrary to Rhinehart's argument, the ALJ did not place undue emphasis on Rhinehart's daily living activities in his analysis; rather, he properly considered Rhinehart's activities as one factor in assessing the consistency of the medical source opinions of

record and the RFC ultimately assigned to Rhinehart.[10]  20 C.F.R. § 404.1529(c)(3); *compare Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility), *and Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004), *with Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home"), *and Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).  For example, Rhinehart's ability to play computer games suggests an ability to perform simple tasks, and his ability to transport himself to doctor's appointments represents an ability to function independently in the community. *See, e.g.*, *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (affirming ALJ's conclusion that reading and playing cards reflected an ability to concentrate).

In sum, the ALJ adequately addressed the factors prescribed in 20 C.F.R. § 404.1527(d) with respect to Dr. Lambertson's opinion, allowing this Court to adequately trace his path of reasoning in discounting the opinion and in assigning Rhinehart's RFC. *See Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) ("The ALJ need only build a bridge from the evidence to his conclusion." (citation omitted)).  Therefore, Rhinehart's first argument is unsuccessful in warranting a remand.

### D.  The ALJ Did Not Err When Posing His Hypothetical to the VE at Step Five

Rhinehart next contends that the ALJ erred at step five when posing his hypothetical to the VE, maintaining that the ALJ failed to include his finding that Rhinehart had moderate

---

[10] The ALJ also noted in his analysis of Rhinehart's mental impairments that he had never been hospitalized on an inpatient basis for a psychiatric reason.  Rhinehart criticizes the ALJ for this notation, stating that he "failed to explain why this was significant" and that the ALJ failed to cite testimony from a medical source that a lack of hospitalization discredits his testimony. (Pl.'s Opening Br. at 19.)  Rhinehart's argument is meritless, as the extent of a claimant's treatment is a relevant consideration in assessing the severity of a claimant's symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(v).

deficiencies in concentration, persistence, or pace.  Rhinehart's second argument, however, achieves the same fate as his first.

To explain, at step two of the five-step sequential analysis, the ALJ must determine whether a claimant's impairment(s) are "severe." 20 C.F.R. § 404.1520.  In determining the severity of a claimant's mental impairments at step two of his five-step analysis, the ALJ addresses the claimant's degree of functional limitation in four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); *see Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001).  The Seventh Circuit Court of Appeals has stated that the ALJ must then "incorporate" these limitations into the hypothetical questions posed to the VE at step five. *Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003) (holding that the ALJ erred when neither his RFC nor his hypothetical question to the VE "[took] into account" his finding at step two that the claimant had deficiencies in concentration, persistence, and pace).  Stated more broadly, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate *all* relevant limitations from which the claimant suffers." *Id*. (emphasis added).

At step two the ALJ found that Rhinehart had moderate difficulties in maintaining concentration, persistence, or pace, as well as moderate difficulties in maintaining social functioning.  After determining that Rhinehart's mental impairments were significant enough to be "severe" but not severe enough to meet a listing-level impairment, the ALJ assigned him an RFC limiting him to simple, repetitive tasks, with the additional limitation that he can be around employees throughout the day but only for occasional conversations and interpersonal

interaction.  Here, contrary to Rhinehart's argument, the ALJ adequately accounted for Rhinehart's deficiencies in concentration, persistence, and pace by assigning him an RFC that limited him to "simple, repetitive tasks," a limitation that was properly incorporated into the ALJ's hypothetical to the VE.

To explain, in assigning the RFC the ALJ reasonably relied upon the opinion of Dr. Klion, who concluded that though Rhinehart was moderately limited in his ability to maintain attention and concentration for extended periods, he could still perform work involving simple, repetitive tasks.  The instant circumstances, therefore, are seemingly analogous to the facts confronting the Seventh Circuit Court of Appeals in *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002).

In *Johansen*, the ALJ determined that the claimant was moderately limited in his ability to maintain a regular schedule and attendance and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. *Id.*  In posing a hypothetical to the VE, the ALJ relied upon the opinion of a consulting physician who stated that because the claimant was not significantly limited in seventeen of twenty work-related areas of mental functioning, he retained the mental RFC to perform "low-stress, repetitive work." *Id.* The Court of Appeals concluded that the ALJ's limitation to low-stress, repetitive work adequately incorporated Johansen's moderate mental limitations, articulating that the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work." *Id.*; *see also Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (concluding that the ALJ adequately captured the claimant's deficiencies in concentration, persistence, or pace in his RFC that limited the

claimant to simple, repetitive tasks, in part because the state agency psychologist concluded in his functional capacity assessment that the claimant could sustain sufficient concentration and attention to perform simple, repetitive, and routine activity); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001); *but see Ramirez v. Barnhart*, 372 F.3d 546, 552-55 (3rd Cir. 2004) (finding that the ALJ's limitation to simple, one-step tasks did *not* adequately capture the claimant's deficiency of concentration, persistence, or pace).

Like the consulting physician in *Johansen*, here Dr. Klion essentially "translated [his] findings into a specific RFC assessment, concluding that [Rhinehart] could still perform low-stress, repetitive work." *Johansen*, 314 F.3d at 288. Furthermore, it is obvious that Dr. Klion's limitation of Rhinehart to simple, repetitive tasks was *directly connected* to Rhinehart's moderate limitations in his ability to maintain attention and concentration for extended periods, his ability to sustain an ordinary routine without special supervision, and his ability to accept instructions and respond appropriately to criticism from supervisors, as Dr. Klion found no other significant limitations with respect to Rhinehart's mental status.[11] *Cf. Kasarsky*, 335 F.3d at 543-44. Moreover, in addition to limiting him to "simple, repetitive tasks," the ALJ also assigned Rhinehart a limitation that he can be around employees throughout the day but only for occasional conversations and interpersonal interaction, thereby taking into account the ALJ's finding at step two that Rhinehart had moderate difficulties in maintaining social functioning.

---

[11] Furthermore, though the VE testified upon cross-examination by Rhinehart's attorney that there would be no jobs available to an individual who was unable to meet competitive standards in terms of performing at a consistent pace, this is irrelevant as the ALJ did not adopt this severe limitation proffered by Dr. Lambertson, but rather adopted the moderate limitation opined by Dr. Klion. *Cf. Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996) (remanding an ALJ's decision that limited a claimant, who had moderate limitations in concentration, persistence, and pace, to "simple work," where the VE specifically testified upon cross-examination that a moderate deficiency in concentration, persistence, or pace would cause problems in the competitive workforce regardless of what the job required from a physical or skill standpoint).

Consequently, substantial evidence indicates that the hypothetical posed by the ALJ to the VE adequately conveyed all of Rhinehart's limitations.  Therefore, Rhinehart's second argument falls short of justifying a remand of the Commissioner's decision.

### E.  The ALJ's Credibility Determination Will Not Be Disturbed

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers*, 207 F.3d at 435.  If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

In a final cursory section of his argument, Rhinehart alleges that the ALJ improperly evaluated the credibility of his "symptom testimony." (Opening Br. at 21.)  Rhinehart's argument contains only two points; the first point simply refers the reader back to Rhinehart's argument concerning the ALJ's discounting of Dr. Lambertson's severe limitations, which as discussed *supra* did not warrant a remand.

Rhinehart's second point is that the ALJ erred "in failing to consider the impact of his psychiatric problems on his underlying disability." (*Id*.)  Contrary to Rhinehart's assertion, "[n]o evidence in the record suggests that the ALJ failed to consider the combined effects of

23

[Rhinehart's] impairments." *Robinson v. Apfel*, No. 97 C 8727, 1999 WL 160068, at \*7 (N.D. Ill. March 12, 1999).  Rather, the ALJ specifically explained that the RFC by definition considers "the effects of physical and/or mental limitations that affect the ability to perform work-related tasks" (Tr. 16 (citations omitted)), and penned four paragraphs on Rhinehart's mental status in his opinion.  Thus, the ALJ certainly did not turn a blind eye to Rhinehart's problems with depression and agoraphobia and subsequently did not err when assessing them. *Compare Clifford*, 227 F.3d at 873 ("The ALJ, rather than blind himself to this condition (and other relevant evidence), should have considered the [obesity] issue with the aggregate effect of her other impairments."), *with Johnson v. Barnhart*, 449 F.3d 804, 807 (7th Cir. 2006) ("[T]here is no indication that in assessing [the claimant's] joint problems the administrative law judge gave insufficient weight to the effect on them of [the claimant's] obesity . . . .").

Therefore, Rhinehart's final attack on the ALJ's decision fails to warrant a remand, as the ALJ built an accurate and logical bridge between the evidence and his credibility determination, *Shramek*, 226 F.3d at 811, and his determination is not "patently wrong." *Powers*, 207 F.3d at 435.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Rhinehart.

SO ORDERED.

Enter for this 17th day of July, 2007.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge